IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

Pension Benefit Guaranty Corporation, on behalf of the
Retirement Program of Liam Ventures, Inc.,

                                    Plaintiff,

    v.

William F. Farley,

Administrative Committee of the Retirement Program of Liam
Ventures, Inc.,

Kevin Donegan,

Sherry McCreary,

Martin Pajor,

Steven Seder,

Todd Sluzas,

David Wilson, and

Unnamed additional members of the Administrative
Committee of the Retirement Program of Liam Ventures, Inc.,

                                      Defendants.

FILED: MAY 02, 2008
08CV2529        TC
JUDGE DOW
MAGISTRATE JUDGE NOLAN

Civil Action No. _____

## **COMPLAINT**

      Plaintiff Pension Benefit Guaranty Corporation ("**PBGC**") brings this action, in its

capacity as the statutory trustee of the Retirement Program of Liam Ventures, Inc. ("**Pension**

**Plan**") to obtain judgment for losses suffered by the Pension Plan as a result of the defendants'

breaches of their duties as fiduciaries, and to obtain such further relief as the Court may deem

just and proper.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to 29 U.S.C. § 1303(e)(3) and 28 U.S.C. §§ 1331 and 1345.

2.      Venue properly lies in this Court pursuant to 29 U.S.C. § 1303(e)(2) and 28 U.S.C. § 1391(a)(2).

## PARTIES

3.      PBGC is an agency of, and a federal corporation wholly owned by, the government of the United States of America, and was established to administer the defined-benefit pension termination insurance program instituted under Title IV of the Employee Retirement Income Security Act of 1974 (as amended, "**ERISA**"), 29 U.S.C. §§ 1101-1461. PBGC is statutory trustee of the Pension Plan pursuant to a May 3, 2005 agreement with the Administrative Committee of the Pension Plan, an agreement that also terminated the Pension Plan effective March 31, 2005, in accordance with 29 U.S.C. §§ 1342 and 1348. PBGC has authority, pursuant to 29 U.S.C. § 1342(d)(1)(B)(iv), to commence and prosecute civil suits on behalf of any pension plan of which PBGC is statutory trustee.

4.      Defendant William F. Farley ("**Farley**") is an individual and at all relevant times owned a controlling interest in, and was sole director and chief executive officer of, LV Ventures, Inc. ("**LV**"). LV (formerly known at various times as "Farley Metals, Inc.;" "Farley, Inc." and "Liam Ventures, Inc.") is a Delaware corporation formed in 1982. LV was the contributing sponsor of the Pension Plan. Farley controlled investment of the Pension Plan's assets. Farley was therefore a fiduciary of the Pension Plan under 29 U.S.C. § 1002(21).

5.     Defendant Administrative Committee of the Retirement Program of Liam Ventures, Inc. (the "**Administrative Committee**") was administrator of the Pension Plan under 29 U.S.C. § 1002(16)(A), a fiduciary of the Pension Plan under 29 U.S.C. § 1002(21), and the named fiduciary of the Pension Plan under 29 U.S.C. § 1102(a).

6.     Defendants Kevin Donegan, Sherry McCreary, Martin Pajor, Steven Seder, Todd Sluzas and David Wilson are individuals who were members of the Administrative Committee. Each was an officer or employee of LV and of additional entities controlled by Farley.  The members of the Administrative Committee were appointed by the board of directors of LV, which consisted of a sole director: Farley.  Each member of the Administrative Committee was a fiduciary of the Pension Plan under 29 U.S.C. § 1002(21).

7.     PBGC intends to name as defendants in this action additional members of the Administrative Committee, if any, upon discovery of their identities.

## FACTS

8.     LV sponsored the Pension Plan, which was a single-employer, defined-benefit pension plan covered by the pension termination insurance program under Title IV of ERISA.

9.     The sponsor of a pension plan is required to make periodic contributions to the pension plan to meet statutory minimum funding requirements ("**Minimum Funding Contributions**").[1] See 26 U.S.C. § 412 (2007); 29 U.S.C. § 1082 (2007).

10.     Entities forming a "controlled group" with a pension plan sponsor are deemed to be members of a commonly controlled group of entities and are jointly and severally liable for

---

[1] Congress designed the minimum funding requirements to ensure that each sponsor of a pension plan contribute over time assets sufficient to meet the plan's current and future liabilities for benefits promised to plan participants.

Minimum Funding Contributions.  See 29 U.S.C. § 1082(c)(11)(B) (2007).

11.     In the early 1990's, LV was failing to meet its current liabilities.  Creditors filed an involuntary bankruptcy petition against LV.  As part of LV's efforts to emerge from bankruptcy, and to avoid termination of the Pension Plan and ensuing liability for the full amount by which the then-present value of the Pension Plan's liabilities for promised benefits exceeded the value of the Pension Plan's assets, LV entered into a certain Funding, Security and Collateral Trust Agreement with PBGC ("**1992 Agreement**").  The 1992 Agreement expressly makes the Pension Plan an intended third party beneficiary and expressly grants the Pension Plan rights to enforce the agreement.

12.     Pursuant to the 1992 Agreement, LV was obligated to make certain contributions to the Pension Plan in excess of statutory Minimum Funding Contributions.  That obligation was secured by a pledge of stock in Fruit of the Loom, Inc., a publicly-traded Delaware corporation ("**FOL**").  Farley was chairman and chief executive officer of FOL and a major shareholder in FOL, directly and indirectly owning stock giving him majority voting power.

13.     In 1999, FOL filed for bankruptcy protection.  All equity interests in FOL were cancelled pursuant to FOL's confirmed Chapter 11 plan.  The FOL stock that LV pledged to secure its obligations to contribute to the Pension Plan became worthless.

14.     In 2000, Farley and members of the Administrative Committee, including Martin Pajor, Steven Seder, Todd Sluzas and Sherry McCreary, met to discuss how LV could escape its obligations under the PBGC Agreement and minimize future contributions to the Pension Plan.  After that meeting, LV never made another contribution to the Pension Plan.

15.     On March 28, 2005, PBGC issued notice of its determination that the Pension Plan should be terminated because it was underfunded and would be unable to pay promised

benefits when due.  By that date, LV had failed to make tens of millions of dollars in Minimum

Funding Contributions.

16.    On May 3, 2005, the Administrative Committee of the Pension Plan entered into

an agreement with PBGC pursuant to which the Pension Plan was terminated, effective March

31, 2005, and PBGC was appointed statutory trustee of the Pension Plan under 29 U.S.C.

§ 1362(b), effective May 3, 2005.

17.    PBGC estimates that, as of the date the Pension Plan was terminated, the present

value of the Pension Plan's liabilities for promised benefits exceeded the value of the Pension

Plan's assets by $121.4 million.

<u>COUNT I:</u>
<u>BREACH OF FIDUCIARY DUTIES IN ADMINISTRATIVE COMMITTEE FAILURE TO ASSERT</u>
<u>INTERESTS OF THE PENSION PLAN AGAINST FRAUDULENT TRANSFERS</u>

18.    PBGC incorporates  paragraphs 1 through 17 of this complaint as if fully set forth

herein.

19.    On March 24, 1999, Farley borrowed approximately $65 million from Nations

Bank (now Bank of America) and Credit Suisse First Boston (together, the "**Farley Lenders**").

20.    FOL guaranteed the loan, with the approval of its board and at the behest of

Farley, its CEO and chairman of its board.

21.    Farley agreed to reimburse FOL for any payments required of FOL under the

guaranty.

22.    Farley caused LV and several affiliates of LV— specifically, LIA, Inc.;

Biotechvest II, Inc.; Biotechvest LP; and OPT, Inc. (hereinafter, with LV, the "**Upstream**

**Guarantors**") — to secure Farley's reimbursement obligations to FOL by pledging, or, in the

case of OPT, mortgaging, their respective assets.

23.    The Upstream Guarantors received nothing, or significantly less than reasonably equivalent value, in return for exposing all of their assets to the risk that Mr. Farley would default on the $65 million loan.

24.    LV and the other Upstream Guarantors formed a "controlled group" within the meaning of 29 U.S.C. § 1082(c)(11)(B) (2007),  jointly and severally liable for contributions to the Pension Plan.  LV was a wholly owned subsidiary of LIA, Inc.  Biotechvest II, Inc. and Biotechvest LP were wholly owned direct or indirect subsidiaries of LV.  OPT, Inc. was owned 100% by Farley, who controlled LV through his 55% ownership interest in LIA, Inc.  The other 45% of LIA, Inc. was owned by a trust that Farley created for the benefit of his minor son.

25.    On or about December 29, 1999, FOL filed for Chapter 11 bankruptcy protection.

26.    Farley defaulted on the  $65 million loan from the Farley Lenders.  On or about October 27, 2000, the Farley Lenders filed a collection action against Farley for approximately $60 million in state court in New York.  The action was removed to the United States District Court for the Southern District of New York, which awarded summary judgment to the Farley Lenders.

27.    The Farley Lenders filed claims for over $60 million in FOL's bankruptcy, seeking to enforce their rights under FOL's guaranty of the loan.

28.    Under FOL's plan of reorganization, the Farley Lenders' claims and judgment against Farley were assigned to the FOL Liquidation Trust.

29.    On or about July 12, 2002, the FOL Liquidation Trust entered into a Settlement Agreement with Farley and the Upstream Guarantors settling:  (1) the claims and judgment against Farley assigned to the FOL Liquidation Trust by the Farley Lenders; and (2) FOL's claims under the Reimbursement Agreement and associated security agreements.

30.     Under the Settlement Agreement, Farley promised to pay $10 million upon consummation of the settlement, to pay another $2 million no later than fifteen months following consummation, and to repay $2.2 million, plus fees, on an outstanding letter of credit.

31.     To secure Farley's obligations under the Settlement Agreement:  (i) LV pledged shares of stock that it owned in Dynavax Technologies Corp. and Cidra Corp.;  (ii) Biotechvest, LP, a member of LV's controlled group, pledged shares of stock that it owned in Exelixis Inc. and Variagenic, Inc.; and (ii) OPT, Inc., another member of LV's controlled group, granted a second mortgage on its real property.

32.     Farley caused LV to directly transfer $5 million to the FOL Liquidation Trust to partially satisfy his own promise to pay $10 million upon consummation of the Settlement Agreement.  In exchange for this payment, LV received nothing or significantly less than reasonably equivalent value.

33.     Farley defaulted on his obligations under the Settlement Agreement.  The FOL Liquidation Trust exercised its rights with respect to the collateral pledged by LV and Biotechvest, LP and the second mortgage lien on real estate of OPT, Inc.

34.     In addition to the foregoing, Farley used his complete control of LV to cause LV to make a series of loans to himself, without the concern for creditworthiness that Farley would have faced from an unaffiliated lender in an arm's-length transaction, and on terms more favorable than Farley could have obtained from an unaffiliated lender in an arm's-length transaction.  LV did not receive reasonably equivalent value in return for making these loans. Farley's promises to repay were deficient consideration because the terms of the loans did not reflect the risk that Farley would default.

35.     On September 30, 2003, Farley, in his capacity as sole director of LV, caused LV

to permanently forgive and release all claims with respect to the full outstanding balance of loans LV had made to Farley — a total of $19,329,957  — citing his own "financial inability to make any substantial payment against such liability now or in the future."

36.     LV had no basis for concluding that Farley was permanently incapable of repaying any substantial part of the loans.  By forgiving the loans, LV gave away valuable claims and did not receive reasonably equivalent value in return.

37.     LV was insolvent at the time of, or rendered insolvent by:  (1) pledging its assets to secure a loan to Farley on which there was a significant likelihood of his default; (2) transferring $5 million to the FOL Liquidation Trust to partially satisfy Farley's own promise to pay $10 million upon consummation of the Settlement Agreement; (3) making the loans to Farley; and (4) forgiving those loans.  As a result, LV was rendered unable to fulfill its obligations to contribute to the Pension Plan.

38.     LIA, Inc.; Biotechvest II, Inc.; Biotechvest LP; and OPT, Inc. were each insolvent at the time of, or rendered insolvent by, pledging or (in the case of OPT) mortgaging their respective assets to secure the loan to Farley.  As a result, each was rendered unable to meet its joint and several liabilities for contributions to the Pension Plan.

39.     During the time period in which the foregoing transactions occurred, Farley caused LV and members of its controlled group to make additional payments to or for the benefit of himself, and distributions up the corporate ownership chain to himself, while LV was insolvent or at high risk of insolvency.  In exchange for these transfers, the transferors received nothing or significantly less than reasonably equivalent value.  As a result, each of the transferors was rendered unable to meet its joint and several liabilities for contributions to the Pension Plan.

40.    Farley, in causing LV and its controlled group members to grant security interests in their assets to secure his own obligations, and to transfer their assets to or for the benefit of himself, intended to enrich himself by diverting for his own use assets otherwise payable in satisfaction of the transferors' obligations to their creditors, including contributions to the Pension Plan.

41.    The Pension Plan was the largest, or one of the largest, creditors of LV and each member of LV's controlled group throughout the period during which the aforementioned transactions occurred.  At all relevant times, the Pension Plan had unfunded liabilities for millions of dollars in benefits that had been promised to Plan participants under the terms of the Pension Plan.[2]  LV and the members of its controlled group were liable, under ERISA and the PBGC Agreement, for Minimum Funding Contributions to the Pension Plan.

42.    The Administrative Committee was comprised of officers and employees of LV, each of whom was employed by additional members of LV's controlled group.  The members of the Administrative Committee knew or should have known that LV and the members of its controlled group were making substantial transfers to or for the benefit of Farley without receiving reasonably equivalent value in return, and that such transfers would render the transferors unable to cover their liabilities for contributions to the Pension Plan.

43.    The Pension Plan, the participants in the Pension Plan and their beneficiaries had an interest in LV and the members of its controlled group being able to make contributions to the Pension Plan.

44.    The Administrative Committee did nothing to protect this interest of the Pension Plan against the threat posed by the various transfers made by LV and the members of its

---

[2] For instance, the present value of the Pension Plan's liabilities exceeded its assets by approximately

controlled group for no consideration or for significantly less than reasonably equivalent value. The Administrative Committee did nothing to assert or protect the Pension Plan's rights as creditor while Farley drained the sponsor and its affiliates of assets needed for pension contributions.  The Administrative Committee did not seek to enforce the rights and remedies available to the Pension Plan under applicable fraudulent conveyance law.  The Administrative Committee did not seek injunction on behalf of the Pension Plan, nor seek rescission of any transfers, nor seek any other legal or equitable remedy available under applicable fraudulent conveyance law, nor demand that LV and the members its controlled group cease and desist from fraudulently transferring their assets and reverse fraudulent transfers already made.

45.     A prudent, loyal, diligent fiduciary would have acted to protect the Pension Plan from fraudulent conveyances by, at a minimum:  (1) demanding that LV and its controlled group members cease fraudulent transfers of their respective assets and unwind fraudulent transfers already completed; and (2) if such demand went unmet, diligently pursuing legal and equitable remedies available under applicable fraudulent conveyance law.  A prudent, loyal, diligent fiduciary would have pursued such remedies until the probable resulting improvement in the Pension Plan's financial position and prospects, given the likelihood of success on the merits, was less than the costs incurred in pursuing such remedies.

46.     The Administrative Committee did not take these minimal measures to protect the Pension Plan from fraudulent conveyances.

47.     The Administrative Committee thus breached its fiduciary duties under 29 U.S.C. § 1104.  Each of the members of the Administrative Committee breached his or her fiduciary duties under 29 U.S.C. § 1104 and co-fiduciary duties under 29 U.S.C. §§ 1105(a)(1) and

_____

$32 million on January 1, 1999 and $39 million on January 1, 2002.

1105(a)(3), unless he or she dissented from the Administrative Committee and undertook reasonable efforts to remedy the breach by, at the very least, communicating dissent in writing and in a timely manner.  None of the members of the Administrative Committee undertook such a reasonable effort.

48.    Had the Administrative Committee diligently pursued the Pension Plan's rights in a manner consistent with their fiduciary duties, assets fraudulently transferred would have remained in or been returned to the transferor and would have been available for contributions due the Pension Plan.  The Administrative Committee's failure to assert the Pension Plan's rights thus caused a substantial loss to the Pension Plan.

WHEREFORE, PBGC respectfully requests that this Court enter judgment against the Administrative Committee and each of the members of the Administrative Committee, and in favor of PBGC, in its capacity as statutory trustee of the Pension Plan, (1) declaring that the Administrative Committee and its members breached their respective fiduciary duties under 29 U.S.C. § 1104, (2) awarding money damages, pursuant to 29 U.S.C. § 1109, for losses to the Pension Plan resulting from such breaches of fiduciary duty, and (3) declaring each of the members of the Administrative Committee liable for the breach of the whole Administrative Committee pursuant to 29 U.S.C. §§ 1105(a)(1) and 1105(a)(3), and awarding money damages for losses to the Pension Plan resulting from such breaches of fiduciary duty.

### COUNT II:
### SELF DEALING & PROHIBITED TRANSACTION IN THE CONTRIBUTION OF ENVIRONMENTALLY CONTAMINATED REAL ESTATE TO THE PLAN

49.    PBGC incorporates  paragraphs 1 through 48 of this complaint as if fully set forth herein.

50.    On September 15, 1999, Farley caused LV to contribute real property to the

Pension Plan in lieu of cash contributions.  Farley caused the Pension Plan to accept the contribution and immediately lease the property back to LV, as tenant, and, in turn, to Tool & Engineering Company, an affiliate of LV, as sub-tenant.

51.    The contributed property was environmentally contaminated.

52.    Farley caused the Pension Plan to pay for investigation and remediation of the environmental contamination.

53.    It was in LV's interest to shift the risk of environmental liability and the cost of environmental remediation from itself to the Pension Plan, while retaining use of the property through the contribution-leaseback transaction.  Farley, who, with a trust for the benefit of his minor son, indirectly owned 100% of LV, shared LV's interests.  Farley knew or should have known that the contribution-leaseback, combined with causing the Pension Plan to bear the risk of environmental liability and the costs of remediation, constituted use of the Pension Plan's assets for the benefit of LV and, thereby, himself.

54.    LV sued the prior owner of the property, NL Industries, Inc., for the cost of cleanup.  The Pension Plan joined the suit as plaintiff.

55.    The suit was settled after PBGC became statutory trustee of the Pension Plan.  At PBGC's insistence, the proceeds of the settlement were transferred directly from NL to the Pension Plan.  The proceeds were less than the amount the Pension Plan spent on investigation and remediation of the environmental contamination.

WHEREFORE, PBGC respectfully requests that this Court enter judgment against Farley, and in favor of PBGC, in its capacity as statutory trustee of the Pension Plan, (1) declaring that Farley violated 29 U.S.C. §§ 1106(a)(1)(D) and 1106(b)(1) by causing LV to contribute the contaminated property to the Pension Plan, and the Pension Plan to accept

contribution of the contaminated property, to enter into the contribution-leaseback transaction, to pay for the cost of environmental investigation and remediation, and to bear environmental liabilities; and (2) awarding money damages, pursuant to 29 U.S.C. § 1109, for losses to the Pension Plan resulting from such conduct.

**COUNT III:**
**SELF DEALING, BREACH OF FIDUCIARY DUTY OF LOYALTY, & PROHIBITED INVESTMENT OF PLAN ASSETS IN ENTITIES IN WHICH INVESTMENT MANAGER HAD SUBSTANTIAL INTERESTS**

56.     PBGC incorporates paragraphs 1 through 55 of this complaint as if fully set forth herein.

57.     Farley controlled investment of the Pension Plan's assets.

58.     Beginning no later than 1997, and until PBGC became statutory trustee of the Pension Plan on May 3, 2005, Farley engaged in a pattern and practice of causing the Pension Plan to invest in entities in which he possessed a substantial direct or indirect interest. For example, at the end of 2001, the Pension Plan held: (1) at least $5.8 million in equities in non-public companies in which Biotechvest, LP also held substantial equity interests totaling at least $3 million, and (2) $3.6 million in limited partnership interests in JK&B Capital III, L.P., a venture capital fund in which Biotechvest, LP held substantial limited partnership interests. Biotechvest, LP was under Farley's control and was at all relevant times wholly owned, directly or indirectly by Farley, his wife, and a trust Farley created for the benefit of his minor son.

59.     By causing the Pension Plan to invest in entities in which he himself possessed a substantial direct or indirect interest, Farley benefited himself — providing himself leverage in capitalizing entities he invested in, and increasing the value of his own direct and indirect interests by, among other things, ensuring that those entities were adequately capitalized.

60.     Certain of the Pension Plan's investments in entities in which Farley owned

substantial interests resulted in losses to the Pension Plan.

WHEREFORE, PBGC respectfully requests that this Court enter judgment against Farley and in favor of PBGC, in its capacity as statutory trustee of the Pension Plan, declaring that, in each instance in which Farley caused the Pension Plan to invest in an entity in which he himself possessed a substantial direct or indirect interest, Farley:

      a.   dealt with assets of the Pension Plan in his own interest or for his own account, in violation of 29 U.S.C. § 1106(b)(1);

      b.   failed to act solely in the interests of the Pension Plan's participants and beneficiaries and for the exclusive purposes of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Pension Plan, all in violation of 29 U.S.C. § 1104(a)(1)(A); and

      c.   caused the Pension Plan to engage in transactions that Farley knew or should have known constituted direct or indirect transfers of assets of the Pension Plan to, or use by or for the benefit of, a party in interest, in violation of 29 U.S.C. § 1106(a)(1)(D);

and awarding money damages, pursuant to 29 U.S.C. § 1109, for the sum of losses to the Pension Plan from each loss-producing investment in an entity in which Farley possessed a substantial direct or indirect interest.

### COUNT IV:
### BREACH OF FIDUCIARY DUTIES OF DIVERSIFICATION, CARE, SKILL, DILIGENCE AND PRUDENCE IN ALLOCATION AND MANAGEMENT OF PLAN INVESTMENTS

61.    PBGC incorporates  paragraphs 1 through 60 of this complaint as if fully set forth herein.

62.    At all relevant times, Farley controlled investment of the Pension Plan's assets. Farley chose the Pension Plan's investments, how much and when the Pension Plan invested, and how much and when it divested.

63.    Throughout the period beginning no later than January 1, 2000, and until PBGC became statutory trustee of the Pension Plan's assets on May 3, 2005, Farley regularly or continuously breached his fiduciary duties under 29 U.S.C. § 1104 to diversify the Pension Plan's investments, and to manage those investments with care, skill, diligence and prudence, including in the following ways:

64.    In allocating Pension Plan assets, Farley failed to prudently consider the Pension Plan's prospective cash flows — its cash income from contributions and investment returns, its cash outflows for benefit payments and plan expenses, and sales of plan assets that would be necessary to make up shortfalls in income relative to outflow.

65.    As a result, Farley failed to prudently allocate Pension Plan assets between liquid and illiquid investments so that the Pension Plan would consistently have at least enough liquid assets to generate cash to make benefit payments as they came due.

66.    The Pension Plan's stream of payments for promised benefits was readily predictable from the demographics of Pension Plan participants and other data available to Farley.

67.    Farley imprudently over-allocated the Pension Plan's assets in illiquid investments, creating excessive risk: (1) that the Pension Plan would have insufficient cash to pay benefits when due; and, as a result, and (2) that to meet the Pension Plan's liquidity needs, the Pension Plan would have to sell illiquid assets under duress and at significantly lower prices than the Pension Plan would have obtained in sales not made under duress.  These risks were

heightened by the high concentration of Pension Plan assets in venture capital and private equity funds that penalized investors for failing to make additional cash contributions when called upon to do so and for cashing out before scheduled distributions.

68.    Farley allocated over 30% of the Pension Plan's assets, and at times over 40%, to venture capital and private equity funds, and caused the Pension Plan to, at the same time, hold substantial direct investments in biotechnology and information technology start-ups.

69.    In this way, among others, Farley both failed to diversify the Pension Plan's investments, as required by 29 U.S.C. § 1104(a)(1)(C), and imprudently over-allocated the Pension Plan's assets in high-risk investments that were highly correlated with one another, thereby creating an excessive risk of large losses in the Pension Plan's portfolio.  It was imprudent to expose the Pension Plan to such risk, especially given the already underfunded state of the Pension Plan.  Hoped-for returns on the Pension Plan's high-risk investments did not make such allocation prudent.  A prudent fiduciary, in making allocation decisions, would have: (1) examined the prospective risk-adjusted rate of return for the Pension Plan's asset allocation over the Pension Plan's investment time horizons; (2) recognized that it compared unfavorably with risk-adjusted rates of return for patterns of allocation within or near the range of conventional pension plan asset allocations; (3) concluded that, at best, the Pension Plan would bear an unreasonable risk of large losses if its assets were allocated as the Pension Plan's ultimately were; and (4) accordingly, allocated assets in a more conventional, less risky manner, one that took account of high number of retirees already receiving benefit payments and the resulting short investment time horizon.  The high-risk allocation was all the more imprudent given the already underfunded state of the Pension Plan, and given that LV and the members of its controlled group had become, or were at high risk of becoming, incapable of making further

contributions to the Plan (a risk well known to Farley, since he had created it by draining the entities of their assets through fraudulent conveyances to or for the benefit of himself). Farley thus caused the Pension Plan to gamble with money it could ill afford to lose.

70.　　Farley also imprudently caused turnover in Pension Plan investments, turnover significantly greater than even the high end of the normal range, thereby causing the Pension Plan to incur excessive fees and expenses that risked negatively impacting the overall performance of the Pension Plan's portfolio.

WHEREFORE, PBGC respectfully requests that this Court enter judgment against Farley and in favor of PBGC, in its capacity as statutory trustee of the Pension Plan, declaring that, in discharging his duties managing investment of the Pension Plan's assets, Farley breached his fiduciary duties under 29 U.S.C. § 1104, and awarding money damages, pursuant to 29 U.S.C. § 1109, for the resulting losses suffered by the Pension Plan.

**REMAINING PORTION OF THIS PAGE INTENTIONALLY LEFT BLANK**

### PRAYER FOR ADDITIONAL RELIEF

71.     PBGC incorporates paragraphs 1 through 70 of this complaint as if fully set forth

herein.

PBGC respectfully requests that the Court grant such additional relief as the Court deems

just and proper.


Respectfully submitted,


Dated: May 2, 2008                      ISRAEL GOLDOWITZ
                                        Chief Counsel
                                        KAREN L. MORRIS
                                        Deputy Chief Counsel
                                        KARTAR KHALSA
                                        Assistant Chief Counsel
                                        JOHN GINSBERG
                                        Attorney

                                        PENSION BENEFIT GUARANTY CORPORATION
                                        1200 K Street, N.W.
                                        Washington, D.C. 20005
                                        Phone: (202) 326-4020, ext. 3714
                                        Fax.:   (202) 326-4112
                                        E-mail: ginsberg.john@pbgc.gov & efile@pbgc.gov

Member of the General Bar &
Designated Local Counsel for Service:     /s/ Thomas P. Walsh
                                        THOMAS P. WALSH
                                        Assistant United States Attorney
                                        U.S. ATTORNEY'S OFFICE, N.D. ILLINOIS
                                        219 Dearborn St., 5th Floor
                                        Chicago, IL 60604-1702
                                        Phone:  (312) 353-5300
                                        Fax:  (312) 353-2067